**UNITED STATES of America**

**v.**

**Ben Aris RAMIREZ.**

**Criminal No. B–07–041–1.**

United States District Court, S.D. Texas, Brownsville Division.

Signed Aug. 1, 2014.

Oscar Ponce, United States Attorney's Office, Brownsville, TX, James L. Turner, United States Attorney's Office, Houston, TX, for United States of America.

Jeffrey L. Wilde, Federal Public Defender's Office, Brownsville, TX, Marjorie A. Meyers, Federal Public Defender, Houston, TX, for Ben Aris Ramirez.

### MEMORANDUM OPINION AND ORDER

ANDREW S. HANEN, District Judge.

Before the Court is a request by Defendant Ben Ariz Ramirez (hereinafter "Ramirez" or "Defendant") to relocate from

Los Angeles, California, to Baton Rouge, Louisiana. In 2007, Defendant was found guilty of illegal reentry under 8 U.S.C. § 1326(a) and (b) after having been convicted of an aggravated felony and subsequently deported from the United States. This Court sentenced him to sixty-three months in custody, followed by three years of supervised release. *United States v. Ramirez*, No. B–07–CR–041 (S.D.Tex. Oct. 2, 2007). To say the least, this Court is somewhat surprised by Ramirez's request: he was found guilty of violating this country's immigration laws and, since Ramirez was a violent criminal and illegally in this country, no one could reasonably doubt that after serving his sentence he would be deported again. He had already been denied asylum once and had been deported on multiple occasions. Further, he had illegally entered the United States at least three times prior to the 2007 sentence imposed by this Court. In fact, the institution of a term of supervised release term was intended to serve as an extra measure of deterrence to help dissuade Defendant from committing yet another violation of the laws of the United States.

### A. *Background*

Ramirez, an El Salvadoran citizen, illegally entered the United States the first time at a young age. In the late 1980's, he apparently received permission to remain in the United States. While living in Los Angeles, he became a member of the La Mirada Locos gang and embarked on a life of crime. La Mirada Locos is, according to the website of the Los Angeles Police Department, one of its top ten targeted gangs. TOP TARGETED STREET GANGS. LAPD online, http://www.lapdonline.Org//a-gangs (last visited on July 25, 2014). He was violent as a youth—an attribute he continued to display into his adulthood. He committed a number of serious crimes, many of which involved the use of weapons. The following are the most notable criminal convictions and arrests in Ramirez's lengthy criminal history:

***Major Juvenile Convictions*** :

1992 **Possession of a Controlled Substance For Sale**

**Possession of a Concealed Weapon (gun)**

1993 **Possession of a Knife on School Property**

1993 **Burglary/Receiving Stolen Property**

***Major Adult Convictions:***

1994 **Receiving Stolen Property**

1994 **Possession of Cocaine**

[Spent nine months in jail]

1998 **Resisting Arrest (2 counts), Carrying a Concealed Weapon (gun) in a Vehicle**

1998 **Resisting Arrest**

[Spent forty-five days in jail]

1999 **Robbery (with a 9 mm semiautomatic pistol); Possession of Ammunition (the second count, possession of a firearm with two priors, was apparently dismissed as part of the plea agreement.)**

[Spent two years in custody and was deported]

[Entered United States illegally in 2004—Was Not Prosecuted and Was Deported in 2005]

2007 **Alien Unlawfully Found in the United States After Having Been Convicted of an Aggravated Felony and After Having Been Deported**

[Spent almost five years in custody]

***Other Significant Arrests*** (with no resulting convictions):

1997 **Possession of Narcotics—Controlled Substance and Controlled Substance Paraphernalia (no record of disposition)**

1999 Attempted Murder; Assault With a Firearm (charges eventually dismissed)

In 2003, Ramirez was deported after having been sentenced to four years in prison for an armed robbery conviction. He reentered the United States illegally in December of 2004, and remained here until authorities caught him at a bus station in Abilene, Texas. He was not prosecuted, however, and authorities merely deported him to El Salvador in 2005.

In January of 2007, Defendant attempted to enter the United States a third time by falsely and illegally representing himself as a citizen using his old California driver's license. When confronted by Customs Officers with evidence that he was a citizen of El Salvador, he invoked his right to silence and requested a lawyer. Ultimately, Ramirez was charged with illegal reentry and waived a jury trial. At his trial before this Court, Ramirez's main defense was that he was an American citizen. There was no evidence to support his claim, however, and in June of 2007 this Court found him guilty—a finding that was later affirmed on appeal.

Given his extensive history of violent conduct against others in the United States, this Court sentenced Ramirez to sixty-three months in custody to be followed by 3 years of supervised release—a sentence that comported with the applicable United States Sentencing Guidelines (hereinafter "U.S.S.G." or "Guidelines") at the time. After serving his sentence, Ramirez should have then been deported—what should have been an inevitable consequence under relevant immigration laws for a noncitizen convicted of dangerous crimes.

Instead, unbeknownst to the Court, Defendant was released from prison and was not deported. In October of 2013, an immigration judge granted him deferral of removal under the Convention Against Torture (hereinafter "CAT"). Article 3 of the CAT prohibits the deportation of an alien to a country "where there are substantial grounds for believing that he would be in danger of being subjected to torture."[1] Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment, art. 3, S. Treaty Doc. No. 100–20, 1465 U.N.T.S. 85. Torture is defined in Article 1 of the CAT as "severe pain or suffering, whether physical or mental, ... for any reason based on discrimination of any kind," inflicted by or with the consent of a public official. *Id.*[2] The CAT was ratified by the Senate in 1998 under Section 2242 of the Foreign Affairs Reform and Restructuring Act (hereinafter "FARR"), see Pub.L. No. 105–277, 112 Stat. 2681, 2681–821, and eligibili-

1. This Court recognizes the existence of four different outcomes under the CAT. One may be given asylum, withholding of removal, deferral of removal, or denied relief. Ramirez was granted deferral of removal. The Court in this opinion may use these terms interchangeably in a generic sense, not in their technical sense since under the first three outcomes the result is the same: one gets to stay in the United States.

2. The full provision defines torture as:
[A]ny act by which severe pain or suffering, whether physical or mental is intentionally inflicted on a person for such purposes as obtaining from him or a third person information or a confession, punishing him for an act he or a third person has committed or is suspected of having committed, or intimidating or coercing him or a third person, or for any reason based on discrimination of any kind, when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity. It does not include pain or suffering arising only from, inherent in or incidental to lawful sanctions.
*Id.* art. 1.

ty for relief under CAT is governed by regulations codified in 8 C.F.R. § 1208.1.[3] Under these regulations, an applicant for CAT relief must prove that it is more likely than not she would be tortured by the state if removed to that country. 8 C.F.R. § 1208.16(c)(2); *id.* § 208.16(c)(2).[4]

The immigration judge, who granted Defendant deferral of removal, held that he was eligible for CAT relief because he would "more likely than not" be tortured by the El Salvadoran government due to his past "political opinions." *In The Matter of Ramirez Alvarez,* No. A 090–044–427 (EOIR, U.S.Imm. Sept. 25, 2012). In support, the judge cited the Defendant's testimony during the removal proceedings.[5] Unlike the immigration officials in 2005, the immigration judge concluded from the apparently unrebutted evidence that Defendant was likely to be tortured as a result of the El Salvadoran Government's actions or willful blindness. There is no way for this Court to gauge the amount of opposition, if any, made to Defendant's CAT application by the Government. The Court finds the result of this immigration decision to be incredible. It was entirely based upon Ramirez's own testimony.[6] The same facts presented to the immigration judge were found to be insufficient in 2005. Further, since 2005, Ramirez has proven himself to be an individual who has lied on multiple prior occasions and who specifically has a track record of lying to get into this country.

According to the current regulations, if an alien is eligible for CAT relief, he may be granted either withholding of removal or deferral of removal. 8 C.F.R. § 1208.14–17. The alien must be denied withholding of removal and in its place be granted deferral of removal under the CAT if the Attorney General decides that:

> (i) the alien ordered, incited, assisted, or otherwise participated in the persecution of an individual because of the individual's race, religion, nationality, member-

3. The CAT was a non-self-executing United Nations Treaty and therefore required enabling legislation. *See Medellin v. Texas,* 552 U.S. 491, 505, 128 S.Ct. 1346, 170 L.Ed.2d 190 (2008) ("[W]hile treaties may comprise international commitments ... they are not domestic law unless Congress has either enacted implementing statutes or the treaty itself conveys an intention that it be 'self-executing' and is ratified on these terms.") (internal citations and quotation marks omitted); *Pierre v. Attorney Gen. of U.S.,* 528 F.3d 180, 185–86 (3d Cir.2008) (noting that CAT required enabling legislation).

4. There are two identical sets of regulations to ensure compliance with the CAT that apply to two different agencies. One set applies to the Department of Homeland Security (hereinafter "DHS") while the other applies to the Department of Justice, Executive Office for Immigration Review (EOIR). *See* Aliens and Nationality; Homeland Security; Reorganization of Regulations, 68 Fed.Reg. 9824–01 (Feb. 28, 2003).

5. According to this uncorroborated testimony, in 2000, Defendant was arrested by El Salvador police and placed in a cell with violent MS–13 gang members who beat him. Furthermore, Defendant participated in multiple news interviews about police brutality, which were observed by the police. During the last interview, police officers retaliated by forcing him into a bathroom, partially stripping him, and beating him. Defendant also testified that he was attacked by MS–13 members and sought police protection but his request was refused. *These facts were all known in 2005 when he was first denied asylum.* An alleged expert also testified at trial to the effect that the El Salvadoran government does not protect citizens from gang violence and indiscriminately targets individuals with gang tattoos, regardless of whether they are active gang members.

6. As stated in the prior footnote, the Court realizes that another witness testified as to conditions in El Salvador, but it is only Ramirez's testimony that supports any finding that would qualify him under the CAT.

ship in a particular social group, or political opinion;

(ii) the alien, having been convicted by a final judgment of a particularly serious crime is a danger to the community of the United States;

(iii) there are serious reasons to believe that the alien committed a serious non-political crime outside the United States before the alien arrived in the United States; or

(iv) there are reasonable grounds to believe that the alien is a danger to the security of the United States.

8 U.S.C. § 1231(b)(3)(B); 8 C.F.R. § 1208.16(d)(2) (requiring the denial of applications for withholding of removal under the CAT if the applicant falls within Section 241(b)(3)(B) of the Immigration and Nationality Act (codified in 8 U.S.C. § 1231)).[7] He may be removed to any other country. 8 C.F.R. § 1208.16(b)(2). If the alien receives deferral of removal, he is subject to two "disadvantages": he does not have a right to release from immigration custody, 8 C.F.R. § 1208.17(c), and deferral may be more readily terminated, 8 C.F.R. § 1208.17(d), (e), (f). In practical terms, however, these differences are meaningless. Defendant was granted deferral of removal instead of withholding of removal due to his past criminal history. He was then released back onto the streets of Los Angeles.

The regulations, or at least the Government's interpretation of the regulations, are especially interesting given the enabling legislation for the CAT. FARR, which is apparently the CAT enabling act, contains one particularly pertinent provision:

(c) *Exclusion of certain aliens.* To the maximum extent consistent with the obligations of the United States under the convention subject to any reservations, understandings, declarations and provisions contained in the United States Senate resolution of ratification of the Convention, *the regulations described in subsection (b) shall exclude from the protection of such regulations aliens described in section 241(b)(3)(B) of the Immigration and Naturalization Act (8 U.S.C. 1231(b)(3)(B)).* (Emphasis added.)

Pub.L. No. 105–277, 112 Stat. 2681, 2681–822 (sec. 2242(c)). Section 241(b)(3)(B) of the Immigration and Naturalization Act specifically states that aliens who have been convicted of serious crimes are *not* eligible for relief.[8] 8 U.S.C. § 1231(b)(3)(B). The Attorney General in this case found that Ramirez was just such a criminal.

That being the case, according to the express intent of Congress, Ramirez should not have been granted any relief.[9]

---

7. The regulation states:

   Except as provided in paragraph (d)(3) of this section, an application for withholding of removal under section 241(b)(3) of the Act or under the Convention Against Torture shall be denied if the applicant falls within section 241(b)(3)(B) of the Act or, for applications for withholding of deportation adjudicated in proceedings commenced prior to April 1, 1997, within section 243(h)(2) of the Act as it appeared prior to that date.

   8 C.F.R. § 1208.16(d)(2).

8. Section 1231(b)(3)(B) lists individuals who are not entitled to relief, for example, aliens who were convicted of a particularly serious crime and are a danger to the community, aliens who committed serious nonpolitical crimes outside of the United States, and aliens who pose a danger to the security of the United States.

9. The interplay between the CAT, FARR, and the regulations which implement the former are beyond the scope of this opinion. One author describes the FARR language as a compromise in Congress, but also acknowl-

If the Government interprets its own regulations as allowing relief, then either the regulations do not reflect Congress's intent and/or the Government's interpretation does not reflect Congress's intent. Either way, it seems that Congress did not intend that dangerous criminals, who have been convicted of serious crimes in the United States, be entitled to relief under the CAT. Despite Congress's specific instruction found in the FARR, as quoted above, Ramirez was granted relief and turned loose on society.

The Court finds this situation to be quite perplexing and, in fact, finds that it borders on the absurd. Ramirez is a hardened felon with not one, not two, but three felonies involving weapons. He had legal status, but lost it due to his violent activities. He has a proven track record of lying to get into the United States. Ramirez is a person devoid of credibility. Why one would believe an individual who

edges that there was at least an attempt by some members of Congress to include similar exceptions as found in the INA. Others suggest that Congress either could not or did not graft a criminal history exception onto the CAT. Sklar, Implications of the New Implementing Statute and Regulations on Convention Against Torture Protections, 76 No. 7 *Interpreter Releases*, 265 (1999). That author concludes, without citing authority, that since the CAT contains no exceptions, none were allowable, despite the express language of Congress. But see, Holper, "Specific Intent and the Purposeful Narrowing of Victim Protection Under the Convention Against Torture," 88 *Ore. L.Rev.* 777 (2009), where the author at least recognizes that it was "the congressional intent to limit Article 3 protection so that criminals would not be eligible for this relief from removal."

If Congress wants to fix a border security issue, this may be an easy one to address. While this Court has not conducted any scientific poll, it feels safe in concluding that no reasonable American would desire violent criminals to be imported into this country.

10. See footnote 5 and 6.

had already lied to gain entry into the United States is beyond any reasonable comprehension. Yet, based upon his testimony *alone*,[10] the asylum officer returned him to the streets of Los Angeles.

What is even more perplexing, and quite frankly more dangerous, is that the Government just released Ramirez back into the very population he has terrorized for over a decade. There are no real restrictions on his movements, nor are there any real restrictions on any activities in which he might choose to engage.[11] This Court can only hope that the immigration officials in charge of deporting Ramirez to some country other than El Salvador performs this task with dispatch. Otherwise, the Justice Department has pulled the pin on a hand grenade and lobbed it into the streets of Los Angeles, with the faint hope that it will not go off (for the fourth time).[12]

11. The Court notes that Ramirez is subject to an order of supervision issued by Immigration and Customs Enforcement (hereinafter "ICE"). It, among other requirements, states that he remain in California unless he notifies ICE, that he report any change of address within forty-eight hours, and basically that he not commit any further crimes or associate with known criminals or gang members. There is no practical means for ICE to enforce any of these provisions, nor is there any form of active supervision. Despite the fact that he is a convicted criminal under an order of removal, Ramirez is essentially free to do whatever he wants, wherever he wants.

12. The other important aspect of this case, which remains completely unexplored, is the fact that Ramirez has many other options. There are over one-hundred and ninety other countries in the world besides El Salvador and the United States. In fact, Ramirez traveled the width of Guatemala and the length of Mexico in order to cross into the United States illegally. According to the facts presented here, he traveled without incident and could have stopped anywhere along the way. Further, his own application for asylum details the fact that he spent part of the year of

If this case, which effectively gives a proven violent criminal asylum, is not an aberration, but is, in fact, a new policy, then it is a policy that is dangerous and foolhardy. The Court is concerned about the protection of the innocent public—not with the fact that a proven dangerous criminal might need to relocate to a location with which he is not familiar.

Finally, it is extremely curious to note that both Ramirez's lawyer and the asylum official both characterized Ramirez as being persecuted and thereby eligible for asylum (or technically in this case eligible for "deferral of removal") because of his "political opinion"—not because he was a gang member. This is, at best, disingenuous. All of his "persecution," even according to his own testimony, emanated from his criminal affiliations. None of the actions of which he complains would have happened if he had not been a gang member who was deported because he was a violent individual with gang affiliations who had committed violent crimes.[13] This mischaracterization was clearly done because granting asylum based on one's expression of political views certainly sounds better than granting asylum because of one's criminal affiliations. Indeed, the First Circuit has opined (in an Immigration and Nationality Act context) that "in light of the humanitarian purpose of the INA, Congress did not mean to grant asylum to those whose association with a criminal syndicate has caused them to run into danger." *Cantarero v. Holder*, 734 F.3d 82, 86 (1st Cir.2013) (citing *Arteaga v. Mukasey*, 511 F.3d 940, 944–46 (9 Cir. 2007) and *Bastanipour v. I.N.S.*, 980 F.2d 1129, 1132 (7th Cir.1992)).[14] That is exactly the case here. This legal fiction places the desires of a violent criminal over the security of the United States. If this is the kind of analysis that will be regularly employed, every criminal with any El Sal-

2005 in Costa Rica. He did not complain of persecution there, nor did he give any reason why he returned to El Salvador after residing in Costa Rica if he knew or suspected that he would be persecuted in El Salvador. Mexico, Guatemala, and Costa Rica are only three of the over one-hundred and ninety countries to which Defendant could have immigrated. While this Court is unaware of his criminal record in those countries, it has to be better than his violent record in this country.

13. Even the "facts" Ramirez cites in his asylum brief rely almost exclusively on his gang membership and the resulting prejudice. The fact that he might have complained about his treatment in El Salvador to certain police officials, governmental authorities, and/or to BBC reporters was clearly incidental and after the fact. It does not turn a gang problem into a political debate. This interview occurred in 2004, while the alleged torture, according to Ramirez, started years earlier. Furthermore, this was all known in 2005 when he was denied any immigration relief.

14. This Court is not unaware of the problems that certain gang members, ex-gang members, or rival gang members may face if they are deported to El Salvador. The presence of MS–13 (Mara Salvatrucha) members in El Salvador presents a real challenge not only for a deportee, but also for the El Salvadoran government. MS–13 members in the United States present real problems for our law enforcement officials as well. This Court would perhaps hold a different view for an otherwise law abiding person who was being threatened or tortured by a gang, but that is not the case here. *Ramirez was not deported after his first felony, despite the fact that it was committed with a gun; nor was he deported after his second, third, fourth, fifth, or sixth felony convictions. He was only deported after his seventh felony—the third felony he committed with a firearm.* He tried to get asylum in 2005 on the basis of gang violence in El Salvador, but was turned down. His response to that denial was to return to the United States and commit another felony. His situation is the result of his own choices. For most people, choices have consequences. If he feels persecuted in El Salvador, there are hopefully other countries where he has not attacked innocent people where he could find refuge.

vador connection will have the ability to come into the United States illegally and stay.

## B. *This Current Governmental Policy Will Have Dire Consequences.*

■ This Court has no jurisdiction over an appeal of a decision by the Justice Department to award deferral of removal to an individual—regardless of how meritorious such an appeal might be and regardless of how dangerous the convicted criminal is. Consequently, this Court is certainly not writing to reverse the decision of the asylum official. The Court addresses the asylum decision in such detail for three reasons. First, it must decide the motion of Ramirez to move to Baton Rouge, Louisiana, and the desire he has expressed to continue to be free from supervision by the probation office. (One should note that the Court's prior 2007 judgment did not specify active supervision because Ramirez should have been deported after serving his sentence.)

Second, this Court writes to alert fellow courts, the Justice Department, and the DHS about the dangers that exist for the United States if this case serves as an example of the prevailing decision-making process. This policy flies directly in the face of the 2011 amendments to the United States Sentencing Guidelines, which are predicated upon deportation and specifically assume that foreign criminals will be deported after serving their sentence. If this assumption is erroneous, the Justice Department should be notifying all of the federal judges in America, as well as the United States Sentencing Commission.

Finally and of even greater importance, this Court writes to point out that the policy allowing Ramirez to stay here, if applied across the board, is an open invita-

tion to the most dangerous villains of society, including the individuals that run the Mexican drug cartels. These individuals— the very ones who are responsible for thousands of deaths and the daily mayhem that is currently afflicting both sides of the Rio Grande—will assuredly pursue asylum/deferral based upon the very "reasoning" offered by the immigration court herein. Those cartel leaders will seek, and are seeking, to live unfettered in the United States and no doubt to continue to run their criminal enterprises in both Mexico and the United States; only, under this policy, they will be protected in their criminal pursuits by the laws of the United States and by United States law enforcement officials. This cannot, or at least should not, be the goal of any responsible member of this Government. The Court will address these issues in reverse order.

### 1. THIS POLICY IS AN OPEN INVITATION TO THE CARTEL BOSSES.

Despite the fact that the cartel violence throughout Mexico and on the southwest border of the United States seems to be a topic that most Americans want to ignore, in the last few years there has been at least a minimal amount of attention given to the topic. That being the case, there is little need to give an extensive history of the conflict here. Suffice it to say that the leading cause of criminal activity in northern Mexico and on the Rio Grande border in the United States are the activities of the major Mexican drug cartels. In this area, the primary cartels at work are the Gulf Cartel and the Zetas. Other parts of the United States have to deal with the criminal efforts of other cartels such as Sinaloa, South Pacific, Knights Templar, and Juarez cartels.[15]

---

**15.** *See* Exhibit A.

These cartels initiate and control the vast majority of the drug trade, illegal cash and weapons smuggling, and human trafficking facing Mexico and the United States. It is also common knowledge that they are the proponents of kidnapping, torture, and murder on both sides of the border. This activity has bred an unstoppable chain reaction of violence. Even the military intervention by the Mexican Government in recent years has not been able to stem this tide. This senseless violence includes not only violence in the form of cartel *versus* ordinary individuals, but also violence in the form of cartel *versus* cartel, and cartel *versus* law enforcement/military. The first two categories of upheaval have clearly affected both sides of the Rio Grande, while the last category has, for the most part, been restricted to the Mexican side. It has reached such epic proportions that almost every federal defendant along this part of the border, regardless of the crime with which he or she are charged, claims, often with merit, that his or her illegal conduct was either committed on behalf of the cartels or due indirectly to the threats or actions of the cartels. The cartels have a well-known chain of command and their hierarchy has a seemingly unending supply of human, armament, and monetary assets on which to draw.[16] In some instances, these leaders order and control each sordid, violent act committed; in other instances, they merely tip over the first domino and the rest fall in turn. Regardless, the violence has gone on unabated for the best part (or worst part) of the last decade.

Somewhat ironically, when the very violence they have instigated in Mexico makes their continued presence in Mexico somewhat dangerous, these cartel kingpins hide out (some legally—most illegally) in the United States. Further, many of these individuals, flush with the billions of ill-gotten gains, want to turn those funds into dollars or other assets in the United States. They desire a safer place to protect their stash, so they invest or secret their money in the United States.[17] It has also become common practice for these cartel bosses to move their families into the United States in an attempt to keep them safer from retaliation by rival cartels or by someone bucking the chain of command within their own drug trafficking organization.

Having fostered chaos and violence throughout Mexico and here on the border in the United States, and having moved both their money and their families into the United States, these same cartel leaders will, sooner or later, inevitably be seeking asylum in the United States. This is not mere speculation by this Court. The very same arguments made by Ramirez, and apparently accepted by the Departments of Justice and Homeland Security, will support the cartel chieftains' entry into the United States.[18] If one follows the "reasoning" used in Ramirez's case, these cartel leaders are certain to get asylum, or at least withholding or deferral of removal. They are escaping violence (al-

16. *See* Exhibit B for examples.

17. For example, in Cause No. B–12–CR–303, the defendant cartel boss had transferred millions of dollars to be invested in South Texas real estate.

18. This Division has, among others, the following cases involving alleged cartel kingpins: Cause Nos. B–00–CR–118, B–11–CR– 1021, B–11–CR–1022, B–12–CR–005, B–12– CR–303, B–12–CR–435, B–13–CR–318, and B–13–623. Many of these cases have multiple defendants who are allegedly high ranking cartel chieftains, and many were captured in the United States. At least one, if not more, is currently claiming immigration relief, and is seeking to remain in the United States.

beit violence they either started or fostered). Under the immigration court's reasoning, they are being "tortured" by the Mexican government despite the fact that many would suggest that Mexican law enforcement and/or military troops are merely trying to secure their own country. More importantly, unlike Ramirez, most do not have criminal records in the United States; many do not even have criminal records in Mexico. They, too, have voiced "political opinions" contrary to their government in that they did not want either the government of Mexico or the United States to interfere with their cartel operations. Thus, they are apparently perfectly poised to seek asylum under the reasoning of immigration judge in this case. If a convicted armed robber like Ramirez gets to stay, certainly the local cartel chieftain should get to stay as well.

This Court does not in any fashion consider itself in possession of a "sixth sense" that can mystically foretell the future. This opinion is drafted, however, using its first-hand, in-the-trenches-knowledge of the border situation and with at least a measurable level of common sense. It feels one-hundred percent certain that this prediction is accurate for two reasons.

For one, common sense dictates that certain conduct inevitably causes certain results. One may wish and hope, and perhaps even pass a resolution, that the sun will rise in the west, but it will not. This Court in December of 2013 predicted that the current governmental policy of delivering apprehended-illegal alien children to their illegal alien·parents (who were apparently more successful in their illegal entry), and not deporting these illegally-present parents was soliciting more illegal conduct, and would cause more and more alien children to come into this country illegally. This Court pointed out that instead of enforcing the law, the Government was, in effect, aiding this illegal conduct. Now, six months later, it is clear that the failure of the Government to enforce the laws of this country is reaping what it sowed. It was announced in May of this year that the Government is doubling its original annual estimate of 60,000 illegal alien minors to 120,000–150,000 illegal alien minors. Some estimates go as high as twice that number. (This is five times the 24,000 illegal alien minors apprehended by authorities in the prior year.) It is going to cost the taxpayers billions of dollars. Undoubtedly, this is a consequence of the Government's policy.[19]

That brings this Court to the second reason that it is convinced that this immigration policy will be an open invitation to cartel leaders to cross the river and claim asylum: it is already happening. This Court is currently aware of at least one Cartel Plaza Boss who is claiming asylum.[20] A Cartel Plaza is a geographic territory over which the Plaza Boss rules. That individual basically controls all illegal, and even many legal, activities (by virtue of extortion) that occur in his plaza. In general, a Plaza Boss is in charge of a certain territory for smuggling humans and drugs. He controls the lookouts, enforcers, hitmen, and assassins who work for his branch of the Gulf Cartel.[21]

19. The Court has not seen any official, or even unofficial, estimates of the number of drug dealers, armed robbers, murderers and terrorists who also entered the country while the Border Patrol was distracted by the problems caused by the influx of these children. Obviously, the Government has no way of knowing.

20. This Court emphasizes, as it stated earlier, that it is using the term "asylum" in its generic sense, not in its technical and/or legal meaning.

21. A map of the local Texas geography and the corresponding cartel plazas is attached as Exhibit C.

The Plaza Boss in question commanded a local plaza that borders Texas, just west of Brownsville. Now, having been apprehended for being in the United States illegally, and possibly facing a lengthy prison sentence in the United States, just like Ramirez, this Plaza Boss is seeking to remain in the United States by claiming some qualifying status. It is apparent that, if the Government's current policy regarding asylum/deferral is enforced, he will be a shoe-in because, unlike Ramirez, he has no criminal convictions in the United States. Cartel bosses are individuals who either are, or employ, killers, assassins, and/or kidnappers. They head-up the extortion schemes. These ventures are merely the spin-off activities of their main job, which is trafficking heroin, methamphetamine, cocaine, marijuana, guns, and humans. Like armed robbers, they should not be given the privilege of living in this country. There is no law and no treaty that requires the United States to do this. Clearly, Congress, when it passed the enabling legislation for the CAT, specifically intended to exempt dangerous criminals from its application.

The heads of the DHS and the Justice Department are sworn to uphold the Constitution and the laws of the United States. They are supposed to be protecting those residing in the United States, not criminal recidivists who are here illegally and preying on innocent people. There are millions of United States citizens and legal residents who need this protection. There are also thousands, if not millions, of illegal immigrants who have fled their homeland seeking safety in the United States. These are also individuals who the law, and those charged with enforcing the law, need to protect. Extending the benefits of United States residency to recidivist criminals and hardened crime bosses is not why the concept of asylum/deferral was created. These individuals are not political dissidents or persecuted minorities. It would be somewhat ironic if those who have fled to the safety of the United States, both legally and illegally, from the violence perpetuated by gangs and other criminal organizations in their home country were again confronted by the very gangsters from whom they were trying to flee. Yet, the biggest irony is that the gangsters will be here legally and the non-violent individuals will not.[22]

## 2. THIS POLICY UNDERMINES THE RECENT UNITED STATES SENTENCING GUIDELINES AMENDMENTS

The second problem that arises, if this case is representative of a national policy, is that it undermines the recent changes made by the United States Sentencing Commission (hereinafter "Commission") to the Sentencing Guidelines. In 2011, the Commission amended the Guidelines' provisions (consulted by every federal judge in criminal cases) governing supervised release. That amendment deleted the provision that stated:

**PART D—SUPERVISED RELEASE**

§ 5D1.1 *Imposition of a Term of Supervised Release*

---

**22.** This Court understands that the Administration has just loosened the regulations to allow those who have provided a minimal level of, or incidental support to, terrorists to also get asylum. If asylum is being granted to known violent criminals and proven liars solely upon their own uncorroborated statements, while ignoring their history of past violent conduct, clearly those who are terrorists, those who have helped terrorists, or those who committed drug-related violence will get asylum/deferral just like Ramirez. Officials will just ignore the "minimal" or "incidental" limitation, just like they ignored the past fabrications and three gun-related felonies committed by Ramirez.

(a) *The court shall order a term of supervised release to follow imprisonment when a sentence of imprisonment of more than one year is imposed,* or when required by statute.

(b) The court may order a term of supervised release to follow imprisonment in any other case.

The Commission replaced that section with:

§ 5D1.1 *Imposition of a Term of Supervised Release*

(a) The court shall order a term of supervised release to follow imprisonment—

(1) when required by statute (*see* 18 U.S.C. § 3583(a)); or

(2) except as provided in subsection (c), when a sentence of imprisonment of more than one year is imposed.

(b) The court may order a term of supervised release to follow imprisonment in any other case. *See* 18 U.S.C. § 3583(a).

(c) *The court ordinarily should not impose a term of supervised release in a case in* which supervised release is not required by statute and the *defendant is a deportable alien who likely will be deported after imprisonment.*

U.S. Sentencing Guidelines Manual § 5D1.1 (2011) (emphasis added). Thus, it then became the stated policy of the Guidelines, one which was communicated to all federal judges, that the imposition of supervised release to non-citizens was discouraged. The reasoning behind this change was based in practicality. The Commission told the courts:

*Application of Subsection (c)—In a case in which the defendant is a deportable alien* specified in subsection (c) and supervised release is not required by statute, *the court ordinarily should not impose a term of supervised release.* Unless such a defendant legally returns to the United States, supervised release is unnecessary. *If such a defendant illegally returns to the United States, the need to afford adequate deterrence and protect the public ordinarily is adequately served by a new prosecution.* The court should, however, consider imposing a term of supervised release on such a defendant if the court determines it would provide an added measure of deterrence and protection based on the facts and circumstances of a particular case.

*Id.* § 5D1.1 cmt. n. 5 (Nov. 1, 2011) (emphasis added).

The reasons given for these changes were:

First, the amendment creates an exception to the general rule in § 5D1.1(a) that a term of supervised release be imposed when a sentence of imprisonment of more than one year is imposed or when required by statute. The exception, which appears in a new subsection (c) in § 5D1.1, states that supervised release ordinarily should not be imposed in a case in which supervised release is not required by statute and the defendant is a deportable alien who likely will be deported after imprisonment. A corresponding application note explains that imposing supervised release in such a case is generally unnecessary, although there may be particular cases in which it is appropriate. Non-citizens now are approximately half of the overall population of federal offenders, *see 2010 Sourcebook of Federal Sentencing Statistics,* Table 9 (showing that 47.5% of federal offenders in fiscal year 2010 were non-citizens), and supervised release is imposed in more than 91 percent of cases in which the defendant is a

non-citizen, *see Federal Offenders Sentenced to Supervised Release* at 60. *The Commission determined that such a high rate of imposition of supervised release for non-citizen offenders is unnecessary because "recent changes in our immigration law have made removal nearly an automatic result for a broad class of noncitizen offenders."* Padilla v. Kentucky, 559 U.S. 356, 130 S.Ct. 1473, 1481, 176 L.Ed.2d 284 (2010); *see also id.* at 1478 ("[D]eportation or removal ... is now virtually inevitable for a vast number of noncitizens convicted of crimes."). *Furthermore, such offenders likely would face prosecution for a new offense under the federal immigration laws if they were to return illegally to the United States.*

*Id.* app. c, amend. 756 (emphasis added.) Put simply: why place a· defendant on a supervised release term if he or she is going to be deported?

The Commission's thought process is clear, but recent history has proven it to have been built on two faulty assumptions. First of all, deportable criminals are not being deported. They are being turned loose on our streets. Ramirez is living proof of that. Secondly, those illegal aliens who have been convicted of crimes in the United States and who were actually deported, are illegally returning to this country, but are not being prosecuted.

Consequently, there is no new prosecution to protect the public.

Both of the reasons cited in support of these amendments have been undermined by the failure of the Government to enforce the law. The Government's policy turns the Guidelines upside down. United States citizens who commit a crime serve their time and are then released into society on court-ordered supervised release. While on supervised release, there are many restrictions on their behavior. The goal of supervised release is, at least in part, to ensure that the released individual does not immediately revert to criminal conduct. Another goal is to integrate the person back into the community; he or she is assisted in finding a job and a place to live, and is provided with drug treatment or other forms of counseling when appropriate. Yet, an illegal alien who commits the same crime, if treated like Ramirez, will simply get turned loose on society.

The DHS and the Justice Department should immediately announce to the courts, the public, and the United States Sentencing Commission what is patently obvious—that they will neither deport all of the known criminals who are illegally in the country; nor will they prosecute all of those criminals who, if deported, return illegally.[23] If one judges ·by the results,

---

**23.** This Court, in a cursory ad hoc review of its own recent cases, had the following cases in which illegal aliens, all of whom had criminal records and all of whom were deported, were not prosecuted when they subsequently reentered the United States illegally. They only had to appear due to this Court's order for a violation of this Court's judgment containing a supervised release term. One can only hope that after this Court's sentence, they were appropriately deported.

| Case No. | Date Revocation Judgment Signed | Prior Convictions of Concern |
|---|---|---|
| 1:10CR1115–001 | June 28, 2013 | 3 DWI's and Possession of more than 5 lbs. but less than 50 lbs. of Marijuana |
| 1:10CR646–001 | December 6, 2013 | Possession of Cocaine, Assault, Terroristic Threats |
| 1:10CR815–001 | June 27, 2013 | Theft |
| 1:10CR1352–001 | June 24, 2014 | DWI, Multiple Thefts, Possession of Cocaine |

the illegal aliens already know this. Before sentencing a defendant, courts need to know if the Government does not intend to deport that person regardless of his/her history of violent behavior. Courts also need to know if, despite a person's criminal history and the fact that he or she is currently breaking the law, the Government has no intention of filing new charges against that person should he or she return to the United States illegally.

Congress has dictated to the judiciary multiple factors that judges should consider when sentencing a defendant. According to the law, two such factors are that a sentence should: (1) afford adequate deterrence to criminal conduct; and (2) protect the public from future crimes of the defendant. 18 U.S.C. § 3553(a). If the Government does not intend to deport illegal aliens who have been found guilty of committing multiple violent crimes, and has no intention of prosecuting re-offenders, judges need to know this because, in order to comply with the laws of this nation, they may have to rethink the manner in which they are sentencing individuals.

Finally, courts in the last few decades have tried to reduce sentencing disparities, which was one of the goals leading to the adoption of the Guidelines. Yet, when a court gives a United States citizen a certain sentence followed by a supervised released term as per the governing statutes and the U.S.S.G., and sentences a non-citizen to the same term for the same crime, but with no supervised release term, as per the U.S.S.G., it has, in effect, given the United States citizen a higher sentence for the same crime. In fact, depending on the circumstances, the disparity may be much greater because, if the alien is in the country illegally while committing the crime, he or she would actually be committing two crimes but receiving a lesser sentence for one transgression, and no sentence for the other.

| 1:12CR458–001 | September 27, 2013 | Obstructing Justice, DUI, Evading Arrest |
|---|---|---|
| 1:08CR403–001 | June 27, 2013 | Criminal Trespass, Possession with Intent to Distribute Cocaine |
| 1:10CR754–001 | August 23, 2013 | Possession of Cocaine |
| 1:09CR1577–001 | December 6, 2013 | Multiple Assaults on Women, Forgery |
| 1:05CR965–001 | May 10, 2013 | Multiple Convictions for Drug Trafficking in both Cocaine and Marijuana |
| 1:10CR638–001 | September 27, 2013 | Multiple Convictions for Immigration Offenses |
| 1:10CR892–001 | December 17, 2013 | Multiple Convictions for Domestic Assault |
| 1:12CR291–001 | April 2, 2014 | Sexual Battery |
| 1:09CR173–001 | December 17, 2013 | Multiple Conviction for Drug Offenses and one prior Immigration Felony |
| 1:10CR415–001 | September 11, 2013 | Multiple Theft-related convictions and Evading Arrest |
| 1:12CR968–001 | June 10, 2014 | Theft, Multiple False Identification |
| 1:12CR1135–001 | June 10, 2014 | Possession of Cocaine; Forgery |
| 1:13CR199–001 | June 10, 2014 | Four Burglary Convictions |

There are no doubt hundreds or even thousands that one could add to this list if one systematically studied the docket of all courts and for periods longer than the year represented above. Obviously, some of the underlying offenses are more serious than others, but all defendants had criminal records and none were prosecuted anew. The only reason these cases were brought before the Court is that this Court had given each defendant, like it gave Ramirez, a term of supervision, and its probation office, not the DHS or the Justice Department, brought the case to the Court's attention.

The conclusion is clear: the only consistent protection for the public, albeit not a strong one, is for courts to ignore the Guidelines and give supervised release terms.

## C. Ramirez's Motion

■ As stated above, this Court cannot correct what it considers to be a misguided and dangerous policy. It has no jurisdiction to do so. Consequently, now that Ramirez has been released, this Court is left to resolve the issue as to how to rule on Ramirez's request. This Court hereby orders that it will hold a hearing on Ramirez's request on **August 12, 2014 at 1:30 p.m.** This Court, by separate order, is issuing a summons for Ramirez to appear. The Court is hereby ordering the local United States Attorneys' Office to contact its sister office in Baton Rouge, Louisiana, to obtain its views on Ramirez's request to relocate to Baton Rouge. The Court also hereby orders the Government to produce at the hearing the person most knowledgeable about the immigration supervision of Ramirez, as well as the person at immigration in charge of relocating Ramirez to another country.

The Court hereby appoints the Office of the Public Defender to represent Mr. Ramirez at that hearing. All parties should also be prepared to address the issue of this Court converting Ramirez's supervised release term from unsupervised to supervised or, in the alternative, dropping the supervised release term altogether as requested by Ramirez.

## D. Conclusion

The Government needs to rethink its policy (or practice) of giving asylum/deferral to illegal aliens who have committed dangerous felonies—even if it means enacting new regulations or laws. It is the Government's duty to protect the homeland of the United States and the individuals who reside here. Yet, rewarding gang or cartel members for their own anti-social activities endangers everyone in the United States.

Like many Americans, this Court is happy to envision Main Street America as a melting pot of races, religions, creeds, and ethic backgrounds. This is our heritage. This image is a beacon of freedom which has long been the lodestar for the oppressed and destitute of the world. That picture of diversity, however, is much different than the one that will result if the Government's current brush strokes continue to color the canvas. If the current case is indicative of things to come, the picture being painted will include a diverse variety of felons and violent criminals. Whether this latter picture is politically desirable is beyond this Court's purview and it must leave that decision to the elected representatives of this nation. What *is* in this Court's purview is the fact that this rogue's gallery is being achieved by the failure of the Government to enforce the laws of this country.

All of the individuals in this country, regardless of citizenship, race, creed, gender, sexual preference, religious or ethnic background, and yes, even immigration status, depend on the Government to provide law and order. There are men and women in this county who have sworn to protect and serve and who are willing to do this important task if they are so permitted by their supervisors. The officers and agents who patrol the streets, back roads, rivers, and borders are doing their best to perform that duty, sometimes at great risk and sometimes against overwhelming odds, but their hard work and dedication goes for naught when those in charge create policies that tie their hands.

The Court has never been opposed to accommodating those who come to this country yearning to be free, but this current policy only restricts the freedom of those who deserve it most while giving complete freedom to criminals who deserve it least. This Court specifically expresses no opinion on whether certain indi-

viduals or groups should or should not be entitled to amnesty or even asylum. This is a political question over which this Court cannot and will not get involved. Nevertheless, the current practice with regard to convicted criminals falls within the judiciary's area of concern because it impacts the manner in which a defendant is sentenced.

This current policy endangers America, which must now hope that a person who has committed multiple crimes with firearms has had an epiphany and will not commit another armed robbery. In the case of a cartel leader, society will need to hope that he or she will not bring into the United States more murder and mayhem in addition to the havoc to which he or she has already exposed the United States.

### EXHIBIT "A"

# Mexico's drug cartels

Zones controlled by major cartels

PACIFIC
OCEAN

UNITED
STATES

500 km

ATLANTIC
OCEAN

BEL.

HOND.

NIC.

GUATEMALA

EL SALVADOR

- Sinaloa
- Zetas
- Gulf
- South Pacific
- Templar Knights
- Juarez
- disputed territory

Source: Stratfor

EXHIBIT "B"

Gulf Cartel Structure 2002

Gulf Cartel Structure 2003

Gulf Cartel Structure 2009

# Gulf Cartel Structure
## March to October 2010

Gulf Cartel Structure November 2010

# Gulf Cartel Structure
# March 2011

# Gulf Cartel Structure
## September 2011

EXHIBIT "C"

